AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAR 2 7 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   **18MJ1438**
(2) One LG Model LGMS210 Cellular Telephone, IMEI: )
359998082146004 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2 (incorporated herein)

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963 | Importation of Methamphetamine; Conspiracy to Import Methamphetamine |

The application is based on these facts:
See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Guillermo-Diaz, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/27/18

_____
*Judge's signature*

City and state: San Diego, California      Hon. Jill L. Burkhardt, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE SEARCH OF | AFFIDAVIT OF SPECIAL AGENT GUILLERMO DIAZ IN SUPPORT OF A SEARCH WARRANT |
|---|---|
| (1) One Gold Samsung Galaxy S7 Cellular Telephone, FCC ID: A3LSMS930US; and (2) One LG Model LGMS210 Cellular Telephone, IMEI: 359998082146004. | |

I, Special Agent Guillermo Diaz, having been duly sworn, declare and state as follows:

I

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search (1) a gold Samsung Galaxy S7 cellular telephone, FCC ID: A3LSMS930US ("Target Device 1" or "TD1"); and (2) one LG Model LGMS210 cellular telephone, IMEI: 359998082146004 ("Target Device 2" or "TD2") (collectively, the "Target Devices"), and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to Unlawfully Import a Controlled Substance (the "Target Offenses").

2. The Target Devices were seized from Defendants Iris Gutierrez-Castillo ("Gutierrez") and Adriana Lopez-Espinoza ("Lopez") (collectively, the "Defendants") at the time of their arrest for Importation of Methamphetamine on January 18, 2018 at the

San Ysidro Port of Entry. The Target Devices are currently in the possession of Homeland Security Investigations as evidence and being held at 880 Front Street, Suite 3200, San Diego, California 92101.

3. This search of the Target Devices supports an investigation and prosecution of the Defendants for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the Target Devices, as described in Attachments A-1 and A-2, will produce evidence of the Target Offenses, as described in Attachments B-1 and B-2.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

II

**AFFIANT'S EXPERIENCE AND TRAINING**

5. I am a Special Agent ("SA"), with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by HSI as a Special Agent since February of 2011. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC"), where I received training on conducting federal criminal investigations, including, but not limited to, the gathering of evidence, preservation of a crime scene, and the use of electronic evidence. I am currently assigned to HSI's Contraband Smuggling Group in San Diego, California. My current responsibilities include investigating narcotics smugglers.

2

6.  I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

7.  My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, including methamphetamine, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

8.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

9.  Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular/mobile telephones, in part, because these individuals believe law enforcement is unable to track the phone numbers of calls placed to and from cellular/mobile telephones.

10. Based upon my training and experience as an HSI Special Agent, my participation in the investigation of narcotic organizations, and consultations with law

3

enforcement officers experienced with narcotic trafficking investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, email, Internet, social networking websites, and voice messages.

    b. Drug smugglers believe that cellular telephones provide greater insulation and protection against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephone.

    c. Drug smugglers will use cellular telephones because they are able to monitor the progress of their illegal cargo while the conveyance is in transit.

    d. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations to facilitate the further distribution of their illegal cargo within the United States.

    e. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    f. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry within the United States.

    g. The use of cellular telephones by drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal

4

security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

    a. tending to identify attempts to import methamphetamine or other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine or other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

13. On January 18, 2018, at approximately 10:30 a.m., Gutierrez and Lopez, applied for entry to the United States at the San Ysidro, California Port of Entry. Defendants were riding together in a 2012 Nissan Sentra (the "Vehicle"). Gutierrez was driving the Vehicle, Lopez was in the front passenger seat, and Lopez's minor male child, L.R., was in the rear seat. Gutierrez later stated the car belongs to her but is registered under her husband's name.

14. Customs and Border Protection Officer ("Officer") Byrnes was conducting primary inspections during this time. Officer Byrnes asked all three occupants for their immigration documents and received two negative customs declarations. As he was inspecting them, he believed Gutierrez was being abnormally friendly while Lopez and L.R. avoided making eye contact with him. When asked about the purpose of their trip to the United States, they told him they were planning to go shopping for the day and then return home. Upon querying their border crossing cards, Officer Byrnes received a computer-generated alert indicating there was a discrepancy with one of their visa numbers. Based on the occupants' strange behavior and the alert, Officer Byrnes referred the Vehicle for further inspection.

15. A short time later, Officer Guerra encountered the Vehicle at the Z-Portal X-ray machine in the secondary inspection area. Officer Guerra instructed Gutierrez (in English) on how to drive the Vehicle through the Z-Portal machine. When Gutierrez drove the Vehicle through the Z-Portal machine, she disregarded his instructions and drove the Vehicle faster than the posted speed limit needed to image the Vehicle. When Officer

6

Guerra asked her to drive the Vehicle through the Z-Portal machine again, he asked her to drive "despacito" (slowly in Spanish, and also the name of a popular song). In response to this request, Gutierrez began singing the song Despacito and looking him up and down. Officer Guerra found this behavior to be unusual. When Gutierrez drove the Vehicle through the machine a second time, the image revealed anomalies in both rear quarter panels.

16. During a subsequent physical inspection of the Vehicle, Officer Guerra discovered twenty-three (23) packages in the Vehicle's driver- and passenger-side quarter panels. These packages weighed a total of 12.76 kilograms (28.13 pounds) and field-tested positive for the properties of methamphetamine.

17. As the Vehicle was processed, a Human Narcotics Detection Dog ("HNDD") was requested to conduct an exterior sniff of the Vehicle. The HNDD alerted to the Vehicle's gas tank. When the gas tank was later removed by Apple Towing, officers discovered an additional thirty-five (35) packages in the Vehicle's gas tank. These packages weighed a total of 19.62 kilograms (43.30 pounds) and field-tested positive for the properties of methamphetamine. This brought the total seizure to fifty-eight (58) packages weighing a total of 32.38 kilograms (71.43 pounds).

18. I conducted a post-*Miranda* interview with Gutierrez and she claimed that she did not know there were drugs in the Vehicle. She also claimed that an unidentified person ("UP") had instructed her to go to a Walmart by the I-805 Freeway. Gutierrez claimed that two months ago the UP had called her at work and asked her for money. She said the UP told her that the UP knew where her daughter went to school, knew the location of Gutierrez's work, and knew what car Gutierrez drove. Gutierrez said the UP wanted her to pay 100,000 Mexican pesos. Gutierrez said her husband advised her to turn her phone off, but the calls resumed when she turned it back on. She claimed she reported this to Mexican police, and was advised to change her phone number.

7

19. Gutierrez said the UP's calls stopped after she changed her phone number, but the calls resumed two days before her arrest. She claimed the UP said her kids and husband would be killed if she did not do as she was told.

20. Gutierrez said the UP called her the night before and told again that he would carry out his threats if she did not do what she was told. She said the UP instructed her to come to the United States and meet some people. Gutierrez said she got out of work at approximately 8:00 a.m. that day, and then picked up Lopez and stopped at her house before driving into the United States. Gutierrez said she invited Lopez to come along despite the threats because she wanted company. She said she did not tell Lopez about the threats.

21. Gutierrez said she did not tell her husband or the police when the UP began calling her again.

22. Gutierrez said she has owned the Vehicle since 2012 and did not say the UP ever asked her to provide the Vehicle before crossing into the United States. She said she had the Vehicle's windshield wiper motor repaired approximately three days earlier and the Vehicle was in the mechanic shop for approximately one hour. She said she typically parks the Vehicle in a community parking lot at home and it had been broken into twice, but not in the past few days.

23. Officers seized Target Device 1 from Gutierrez and Target Device 2 from Lopez at the time of their arrest. After the Defendants' arrest, HSI assumed custody of the Target Devices. Gutierrez claimed ownership of Target Device 1 during her post-*Miranda* interview and used it to contact her family.

24. I reviewed the border crossing histories for Gutierrez, Lopez and the Vehicle. This review showed that Gutierrez frequently crosses the border, crossing approximately seventeen (17) times since July 1, 2017. While Gutierrez frequently crossed in the Vehicle, she made four of her trips, or just under 25% of them, in other vehicles. Gutierrez was last referred for secondary inspection in February of 2015. In comparing Lopez's and

Gutierrez's crossing history, Lopez was present for six (6) of Gutierrez's seventeen (17) border crossings since July 1, 2017.

25. Based on my experience investigating narcotics smugglers, Gutierrez and Lopez may have used the Target Devices to coordinate with their co-conspirators regarding the importation and delivery of the methamphetamine, and to otherwise further this conspiracy both inside and outside the United States. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Devices. This data may include information that is relevant to the narcotics smuggling activities of Gutierrez and/or Lopez, including identifying identify other persons involved in their narcotics trafficking activities.

26. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. In this case, evidence supports probable cause to search the Target Devices for information dating back to July 1, 2017. This is based upon a review of Gutierrez's statements, and TECS records showing that Gutierrez has been regularly crossing the Vehicle into the United States for an extended period of time. Therefore, the date range for this search should be from July 1, 2017 to January 18, 2018.

## III

## **METHODOLOGY**

27. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and

9

can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the Target Devices and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV

## CONCLUSION

30. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause

to conclude that Gutierrez and Lopez utilized the Target Devices to facilitate the importation of methamphetamine (and conspiracy to do the same) in violation of Title 21, United States Code, Sections 952, 960, and 963.

31. Given the dates that Gutierrez's statements regarding threatening calls beginning approximately two months before her arrest and her extended crossing history with the Vehicle, probable cause exists to believe that evidence of the aforementioned offenses exists on the Target Devices for the period of July 1, 2017 to January 18, 2018.

32. Because the Target Devices were promptly seized during the investigation of Defendants' drug trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activity committed by Defendants continues to exist on the Target Devices.

33. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B-1 and B-2 (incorporated herein) are likely to be found in the property to be searched described in Attachments A-1 and A-2 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachments B-1 and B-2.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Special Agent Guillermo Diaz
Homeland Security Investigations

Sworn to and subscribed before me this 27 day of March, 2018.

_____
HONORABLE JILL L. BURKHARDT
UNITED STATES MAGISTRATE JUDGE

11

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963 is an LG model LGMS210 cellular telephone, IMEI: 359998082146004 ("Target Device 2").



Target Device 2 is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence and being held at 880 Front Street, Suite 3200, San Diego, California 92101.

## **ATTACHMENT B-2**

Authorization to search Target Device 2 described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in Target Device 2 for evidence described below. The seizure and search of Target Device 2 shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 1, 2017 to January 18, 2018:

   a. tending to identify attempts to import methamphetamine or other federally controlled substances from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine or other federally controlled substances from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or other federally controlled substances from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, Target Device 2; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.